**2016 BNH 012**          Note:   This is an unreported opinion. Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                                                              Bk. No. 13-12978-BAH
                                                                                                    Chapter 7

John Edward Veino,
           Debtor

Plumber's Edge, Inc.,,
a.k.a J.I.T, Inc.,
           Plaintiff

v.
                                                                                                    Adv. No. 14-1025-BAH

John Edward Veino,
           Defendant


*John F. Gallant, Esq.*                          *Dawn DiManna, Esq.*
*Timothy J. Ervin, Esq.*                         *DiManna Law Office*
*Gallant & Ervin, LLC*                           *Fremont, NH*
*Chelmsford, MA*                                 *Attorney for the Defendant*
*Attorney for Plaintiff*


## MEMORANDUM OPINION

### I. INTRODUCTION

The matter before the Court is the complaint filed by the plaintiff Plumber's Edge, Inc. ("PEI"), also known as J.I.T., Inc., against the defendant John Edward Veino (the "Debtor"). PEI seeks a determination that a judgment owed by the Debtor to PEI is excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or (a)(4), or, alternatively, denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(A). The Court conducted a trial on August 4, 2016, at which the Debtor and Russell Dixon ("Dixon"), PEI's principal and sole remaining shareholder,

testified, and twenty-nine exhibits were admitted into evidence.  For the reasons set forth below, the Court will enter judgment in favor of PEI under 11 U.S.C. § 523(a)(4).

**II. JURISDICTION**

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).

**III. FACTS**

The facts necessary to decide this case are not disputed.  This adversary proceeding arises from a nearly twenty-year old dispute between the Debtor and Dixon.  In 1988, the Debtor and Dixon, with three other partners, founded PEI as a plumbing, heating, and sewer supply company located in Chelmsford, Massachusetts.  In addition to being a shareholder and director of PEI, the Debtor executed an employment agreement dated October 12, 1988 (the "Employment Agreement"), engaging him as PEI's General Manager.[1]  In paragraph 16 of the Employment Agreement, the Debtor acknowledged that PEI's customer list was a "valuable, special and unique asset" of the business, and agreed that he would not "during or after the term this Agreement, disclose the list . . . or any part thereof . . . for any reason or purpose whatsoever."[2]  The Debtor further agreed not to disclose "details concerning [PEI's] manner or method of doing business."[3]  On the same date, the Debtor, Dixon, and the other partners executed a Covenant Not to Compete

---

[1] Ex. 2.

[2] Id. at ¶ 16.

[3] Id.

2

and Buy-Sell Agreement (the "Non-Compete Agreement").[4]  In the Non-Compete Agreement, the shareholders, including the Debtor, agreed that following the transfer of their shares, they would not

> either directly or indirectly, as a principal, agent, employee, shareholder, or otherwise, engage or participate in the ownership, management, operation or control of any business similar or identical to the type of business conducted by [PEI] at such time, within a twenty-five (25) mile radius of the principal place of the business. . . .[5]

The Non-Compete Agreement also provided PEI the option to re-purchase a shareholder's stock upon their exit from PEI, and a mechanism by which that purchase price would be valued.[6]

According to Dixon, although PEI had a rough start, it was able to capitalize on the City of Chelmsford's conversion from private to public sewer services, cornering the market and securing valuable supply contracts.  By 1997, PEI had approximately $3,000,000.00 in annual sales.  At that point, only the Debtor and Dixon remained with PEI, Dixon having bought out the shares of the other three partners.

The Debtor and Dixon's relationship soured in March, 1997.  On May 28, 1997, the Debtor and Dixon convened a meeting of PEI's shareholders and directors.[7]  As a result of having acquired the shares of the other three original partners, Dixon held a supermajority of PEI's voting stock and was in full control of the board.  Dixon successfully moved to immediately suspend the Debtor's employment at PEI, restrict the Debtor's access to PEI's property, and appoint himself as PEI's sole officer and director.[8]  The Debtor moved to be released from the provisions of the

---

[4] Ex. 1.

[5] Id. at § I.

[6] Id. at § II.D.

[7] Ex. 3.

[8] Id.

3

Non-Compete Agreement and to be allowed to seek employment anywhere outside PEI, but his motion was defeated by Dixon's vote.[9]  PEI terminated the Debtor in June, 1997.

Following the Debtor's termination from PEI, he and Dixon negotiated for some time about the buyout of the Debtor's shares.  Although the Non-Compete Agreement should have established an agreed purchase price, the Debtor sought two to four times more than what Dixon was willing to pay.[10]  Rebuffed, the Debtor made several other offers to purchase Dixon's shares, which were also declined.  Ultimately, PEI reacquired the Debtor's shares for $26,900.00 on June 10, 1998, in a sale approved by the United Bankruptcy Court for the District of Massachusetts, the Debtor having previously filed a voluntary Chapter 7 petition on December 6, 1996.  The Court also notes that the Debtor's discharge was revoked in the Massachusetts case because he failed to disclose certain assets.

Notwithstanding his termination from PEI, the Debtor continued to meet with PEI's employees at his home.  The Debtor explained that they were his friends and that they regularly enjoyed meals together.  At trial, however, the Debtor admitted that at one of these social gatherings, he asked the current PEI employees to supply him with both the rolodex from his former desk and PEI's customer list (the "Rolodex" and "Customer List," respectively).  He testified that he did not consider these items confidential information, and sought to minimize the importance of the Rolodex by noting the inclusion of non-business contacts, like his doctor and dentist.  It is not disputed that the employees acceded to his request.

On March 16, 1998, despite the Non-Compete Agreement, the Debtor began working at County Supply, Inc. ("County Supply"), PEI's closest competitor, which was located two and one-

---

[9] Id.

[10] To be clear, the record only reflects that the parties could not come to terms, not that either party properly valued the shares according to the Non-Compete Agreement.

4

half miles from PEI's place of business. At trial, the Debtor asserted that he knowingly violated the Non-Compete Agreement by accepting employment at County Supply only after failing to secure employment at thirty-five other businesses and being out of work for nearly a year. He admitted that he brought the Rolodex and Customer List to County Supply, and sold PEI's Customers the same types of products that he had sold to to them while working for PEI. Furthermore, the Debtor testified that he was aware these acts were a breach of his fiduciary duty to PEI.

Dixon testified that he learned from PEI customers that the Debtor was working at County Supply. After confirming these reports by observing the Debtor "behind the counter," Dixon commenced litigation in PEI's name against the Debtor on March 17, 1998 in the Middlesex County Superior Court (the "Superior Court") seeking injunctive relief against the Debtor and damages arising from his various breaches (the "Civil Action"). On July 10, 1998, the Superior Court entered a preliminary injunction against the Debtor enforcing the terms of the Non-Compete Agreement.[11] The Debtor's employment at County Supply ceased on July 13, 1998. During the course of discovery, County Supply produced to PEI the Rolodex and Customer List that the Debtor left behind when his employment at PEI ended.[12]

After obtaining a preliminary injunction in the Civil Action, PEI initiated arbitration of its claims against the Debtor pursuant to the Employment Agreement. The arbitration immediately stalled due to the Debtor's refusal to pay his half of the arbitrator's fee. Eventually, Dixon paid the full amount of the fee so that the arbitration could proceed. In June, 1999, the arbitrator entered an order enjoining the Debtor from "selling, transferring, assigning, encumbering or deeding the

---

[11] Ex. 16.

[12] Exs. 4-6.

land and buildings or other assets owned by [the Debtor] on North Dorchester Road in Wentworth, New Hampshire . . ." (the "Transfer Injunction").[13]

Despite the Transfer Injunction, the Debtor increased the amount of the mortgage on the Wentworth property and, on July 11, 2000, deeded it to his sister as trustee of the Wentworth/Veino Revocable Family Realty Trust of 2000 (the "Trust").[14] At trial, the Debtor could not comprehensively explain his rationale for the transfer to the Trust. Seven days later, on July 17, 2000, the arbitrator entered an award in favor of PEI in the amount of $88,986.00, plus fees and expenses (the "Arbitration Award"), apparently constituting the detriment to PEI's business on account of the Debtor's breaches.[15] The Arbitration Award was subsequently confirmed by judgment of the Superior Court.

By a letter dated August 9, 2000, the Debtor, through counsel, informed PEI's counsel that he lacked any assets capable of satisfying the Arbitration Award and that the Wentworth property had been "taken back by the mortgage holder due to [the Debtor's] inability to refinance the balloon which came due on the note."[16] Dixon and PEI eventually learned that this was false. In 2003, PEI filed an action in the Hillsborough County Superior Court seeking to collect the Arbitration Award. In lieu of further litigation, the parties entered into a settlement agreement by which the Debtor would pay to PEI a total of $58,936.92 in monthly installments of $600.00, with the obligation secured by a mortgage on the Wentworth property, in exchange for a full release (the "2003 Settlement"). Notably, although Dixon knew that the Wentworth property had not been taken by the mortgagee, he testified that he did not learn of the transfer to the Trust until after the

---

[13] Ex. 22 at ¶ 2.

[14] Ex. 36.

[15] Ex. 30.

[16] Ex. 31.

2003 Settlement. The Debtor executed a promissory note, but never supplied the mortgage nor made any monthly payments.

At trial, the Debtor testified that he intended to comply with the 2003 Settlement, but was unable to make the payments due to the loss of his job and having sole custody of his then fourteen year old daughter. He could not say whether it was actually possible for him to supply a mortgage on the Wentworth property at that time given that it was held in Trust. Nevertheless, the Debtor credibly testified that he did not provide the mortgage simply because opposing counsel never presented him with one to execute.

On April 27, 2005, the parties executed a second settlement agreement (the "2005 Settlement"). The 2005 Settlement provided the Debtor with a full release on the condition that the Trust deed to Dixon the Wentworth property, which had an agreed value of $85,000.00, and the Debtor pay the outstanding real estate taxes of $4,205.90 within one year. The parties agree that the transfer occurred shortly after the 2005 Settlement was executed, but the Debtor never paid the real estate taxes. At trial, the Debtor again cited financial inability as the reason for his noncompliance.

On August 24, 2007, PEI, now known as J.I.T., Inc., filed a complaint in the Superior Court to collect the full amount of the Arbitration Award, which had been steadily accruing interest.[17] On November 1, 2007, the Superior Court entered a judgment against the Debtor in the amount of

---

[17] It is unclear why this adversary was filed and primarily prosecuted in the name of PEI if PEI is now known as J.I.T., Inc. The amended complaint, however, added J.I.T., Inc. to the caption as an alternative name of the plaintiff so this issue, while curious, is not material.

7

$227,760.09.[18]  On January 10, 2008, PEI obtained an execution against the Debtor in the amount of $238,458.54.[19]  PEI subsequently began garnishing the Debtor's wages.[20]

On December 11, 2013, the Debtor filed the present voluntary Chapter 7 petition in the District of New Hampshire.  PEI filed its complaint on March 10, 2014, which it later amended on August 20, 2015 (the "Complaint").  The Complaint consists of three counts.  In Count I, PEI advances two theories under 11 U.S.C. § 523(a)(2)(A).  The first is that the Debtor engaged in fraudulent conduct by stealing the Rolodex and Customer Lists and intentionally working for a direct competitor of PEI, all in violation of his Employment Agreement and Non-Compete Agreement.  PEI's second theory is that the Debtor engaged in fraudulent conduct by entering into settlement agreements for the payment of the Arbitration Award that he had no intention of honoring.  In Count II, PEI alleges that the Arbitration Award is nondischargeable under 11 U.S.C. § 523(a)(4) because:

> Veino's debt to PEI arises directly out of Veino's fraud related to his surreptitiously stealing the client list of PEI, while still employed there, using that client list against PEI accepting a position at a competitor of PEI, and breaching his fiduciary duties as an Officer, Director, Shareholder, and Employee of PEI. . . . Veino breached his fiduciary duties to PEI by misappropriating confidential information and trade secrets by fraudulently obtaining same and taking them with him to a direct competitor of PEI's.[21]

Finally, in Count III, PEI alleges that the Debtor should be denied a discharge under 11 U.S.C. § 727(a)(6)(A) in light of his violations of the Transfer Injunction and Arbitration Award.  The Debtor filed an answer to the amended complaint on May 18, 2016.  Notably, the Debtor did not deny the allegations that he stole or otherwise misappropriated the Rolodex and Customer List.

---

[18] Ex. 37.

[19] Ex. 39.

[20] Ex. 44.

[21] Complaint, Docket No. 39 at ¶¶ 64-65.

8

The Court conducted a trial on August 4, 2016, at the conclusion of which, it took the matter under advisement. At trial, PEI stated that it only sought a determination that the amount of its execution, exclusive of any amounts already paid, was nondischargeable and was waiving any entitlement to interest. At the request of PEI, the Court granted it leave to file a memorandum of law regarding Count III by August 12, 2016. Nevertheless, a supplemental brief was never filed.

**IV. DISCUSSION**

From the outset, the Court notes that "[t]he statutory requirements for a discharge are 'construed liberally in favor of the debtor' and '[t]he reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural.'" Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987)). For that reason, a creditor must demonstrate that its "claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." Palmacci, 121 F.2d at 786 (quoting Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994)). The party contesting dischargeability must prove each element by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991).

A. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code exempts from discharge any debt "for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A). To establish that a debt is nondischargeable under this subsection, a creditor must show that:

9

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (citing Palmacci, 121 F.2d at 786) (footnote omitted); see Levasseur v. Old Republic Nat'l Title Ins. Co. (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013); Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 66 (1st Cir. 2012). "The first two elements of the test describe the conduct and scienter required to show fraudulent conduct, while the last four elements embody the requirement the creditor's claim must arise directly from the debtor's fraud." Sega Auto Sales, Inc. v. Flores (In re Flores), 535 B.R. 468, 481-82 (Bankr. D. Mass. 2015) (citing In re Spigel, 260 F.3d at 32).

"A false representation can include a statement of future intention, such as a promise to act, but a promise to act is only a false representation if at the time the debtor made the promise he had no intention of performing." In re Flores, 535 B.R. at 482 (citing Palmacci, 121 F.3d at 786-787). A subsequent change of heart or intervening events will not render a sincere promise to act a false representation. Palmacci, 121 F.3d at 787. The second element requires "intent to deceive, manipulate, or defraud," which may be met by establishing that the debtor knows or believes the representation is false, or that the representation was made recklessly. Id. Fraud may be inferred as a matter of fact from the totality of the circumstances. Id. at 789.

As previously stated, PEI advances two theories under this subsection. PEI first alleges that the Debtor engaged in fraudulent conduct by breaching his Employment Agreement and the Non-Compete Agreement. To succeed under this theory, Court must find that the Debtor never intended to honor the Employment Agreement and Non-Compete Agreement at the time when he

signed them. There is simply nothing in the record to support such an assertion. Indeed, even PEI consistently describes the fraud as commencing "upon [the Debtor's] departure from PEI."[22]

PEI's second theory is that the Debtor never intended to honor the 2003 Settlement or the 2005 Settlement. Each settlement, which provided the Debtor terms by which to pay the Arbitration Award, constitutes an extension of credit under 11 U.S.C. § 523(a)(2). It is also undisputed that the Debtor did not fully comply with either settlement. The record, however, does not establish that the Debtor did not intend to perform each settlement at the time he executed them.

Without question, the Debtor's conduct leading up to the 2003 Settlement, including his violations of the Transfer Injunction and his false representation to PEI's counsel that the mortgagee had foreclosed the Wentworth property, evidence an intent to delay or defraud PEI. The same cannot be said to be true of his conduct following the 2003 Settlement. Putting aside his payment history for a moment, the 2003 Settlement required the Debtor to execute a promissory note, which he did, and grant a mortgage on the Wentworth property, which he did not. Although the Wentworth property was not titled in the Debtor's name at the time, a fact known to PEI, the Court does not find that this was an insurmountable impediment that would render Debtor's promise false. To the contrary, the Court finds credible the Debtor's explanation that he never executed the mortgage for no other reason than because PEI's counsel never presented one to him. Notably, the Debtor and the Trust effectuated the transfer of the Wentworth property as part of the 2005 Settlement after PEI's counsel drafted the deed.

Admittedly, the Debtor never made any payments under either settlement. The Debtor credibly testified that he intended to make the payments, but was unable due to his loss of

---

[22] See Plaintiff's Trial Brief, Docket No. 66 at 1.

11

employment and having to care for his minor child.  Even when the 2005 Settlement reduced his payment obligation to only $4,205.90 within one year of the settlement, the Debtor again cited financial inability for his noncompliance.  While the Court understands PEI's frustration, the fact is that the Debtor substantially complied with the 2005 Settlement by transferring the Wentworth property.  Therefore, the Court cannot conclude that the Debtor did not intend to honor his obligations under the 2005 Settlement at the time he executed it.

For these reasons, the Court finds that the Debtor is entitled to judgment on Count I of the Complaint.

B. 11 U.S.C. § 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code exempts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4). To establish a claim for fraud or defalcation while acting in a fiduciary capacity, a creditor must prove three elements:

> "First, the debt must result from a fiduciary's defalcation under an 'express or technical trust' . . . Second, the debtor must have acted in a fiduciary capacity with respect to the trust. . . . Third, the transaction in question must be a 'defalcation' within the meaning of bankruptcy law." Chao v. Duncan (In re Duncan), 331 B.R. 70, 77 (Bankr.E.D.N.Y.2005) (citations omitted).

Raso v. Fahey (In re Fahey), 482 B.R. 678, 687 (B.A.P. 1st Cir. 2012).  The fiduciary relationship necessary to except a debt from discharge under this subsection is determined by federal law and requires the existence of an express or technical trust.  See FNFS, Ltd. v. Harwood (In re Harwood), 637 F.3d 615, 620 (5th Cir. 2011); Follett Higher Educ. Group, Inc. v. Berman (In re Berman), 629 F.3d 761, 767 (7th Cir. 2011); Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel), 565 F.3d 963, 968 (6th Cir. 2009).  State law definitions, which include relationships

12

"involving trust, confidence, and good faith, are inadequate." See Petrucelli v. D'Abrosca (In re D'Abrosca), No. ADV 09-01070-ANV, 2011 WL 4592338, at *5 (B.A.P. 1st Cir. Aug. 10, 2011); BAMCO 18 v. Reeves (In re Reeves), 124 B.R. 5, 9 (Bankr. D.N.H. 1990). "'The usual elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship.'" In re Fahey, 482 B.R. at 687-88 (quoting Gehlhausen v. Olinger (In re Olinger), 160 B.R. 1004, 1014 (Bankr. S.D. Ind. 1993)). "A technical trust, on the other hand, 'arises under statute or common law.'" Id. at 688 (citing In re D'Abrosca, 2011 WL 4592338, at *5).

In pressing its case, PEI relies on the fiduciary duties that the Debtor owed to PEI as an officer and shareholder. While the Debtor undoubtedly had these duties and breached them by taking a position with and revealing confidential information to a direct competitor, these are not the type of fiduciary duties that fall within the exception to discharge. In New Hampshire, the obligations owed by partners in a closely held corporation are implied by law and do not constitute an express trust with respect to a defined res. In re Reeves, 124 B.R. at 9. Therefore, the Court finds that the Debtor was not acting in the requisite fiduciary capacity to render the debt nondischargeable under this theory.

To establish larceny, however, a creditor need only show that "the debtor fraudulently and wrongfully took the property of another with an intent to convert the property to the debtor's use without the consent of the owner." Amsol, Inc. v. Jaworski (In re Jaworski), No. 01-13677-JMD, 2004 WL 392743, at *9 (Bankr. D.N.H. Feb. 20, 2004). In his Employment Agreement, the Debtor acknowledged that PEI's customer list was a "valuable, special and unique asset" of the business, and agreed that he would not "during or after the term this Agreement, disclose the list . . . or any

13

part thereof . . . for any reason or purpose whatsoever."[23]  Notwithstanding this agreement, the Debtor induced employees of PEI to help him surreptitiously acquire the Rolodex and Customer List from his former office after PEI terminated his employment.  He then took that information and used it in the course of his employment at County Supply to the detriment of PEI as evidenced by the Arbitration Award, which quantified the resulting damage to PEI's business.  The Debtor does not dispute that he did so, or that he left the Rolodex and Customer List with County Supply once his employment there ceased.  The only defense proffered by the Debtor was the incredible assertion that he did not view the Rolodex or Customer List as a corporate asset of PEI.  Accordingly, PEI has established that the Arbitration Award is a debt arising from the Debtor's larceny and is excepted from discharge under 11 U.S.C. § 523(a)(4).

Judgment will enter in favor of PEI with respect to Count II of the Complaint.

### C. 11 U.S.C. § 727(a)(6)(A)

Section 727(a)(6)(A) of the Bankruptcy Code provides that a debtor shall be denied a discharge if "the debtor has refused, in the case—to obey any lawful order of the court, other than an order to respond to a material question or to testify."  By its own terms, 11 U.S.C. § 727(a)(6)(A) "applies to a Debtor's refusal to obey an order 'in the case' and 'of the court,' not 'in any case' and 'of any court.'"  Jackson v. Jackson (In re Jackson), 548 B.R. 353, 386 (Bankr. N.D. Ga. 2016); see also Adar 980 Realty LLC v. Sofer (In re Sofer), 519 B.R. 28, 34 (Bankr. E.D.N.Y. 2014) (denial of discharge only where the debtor refuses to obey a lawful court order issued in the bankruptcy case).  Thus, to establish grounds for denial of discharge under this subsection, PEI must demonstrate that the Debtor refused to obey a lawful order of *this Court*.  PEI, however, has

---

[23] Ex. 2 at ¶ 16.

only alleged that the Debtor failed to obey orders of the Superior Court and the arbitrator. Therefore, PEI has failed to establish a requisite element under 11 U.S.C. § 727(a)(6)(A), entitling the Debtor to judgment on Count III of the Complaint.

## V. CONCLUSION

For the reasons articulated above, the Court will enter judgment in favor of PEI with respect to Count II, and in favor of the Debtor with respect to Counts I and III.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Dated: October 19, 2016              /s/ Bruce A. Harwood
                                     Bruce A. Harwood
                                     Chief Bankruptcy Judge